## Case No. 2,767.

### The CITY OF PARIS.

[14 Blatchf. 531.] [1]

Circuit Court, S. D. New York. June 21, 1878.

COLLISION IN SLIP—MUTUAL FAULT — INTERVENTION BY INSURER — INNOCENT OWNERSHIP OF CARGO—LACHES — COMMISSIONER'S REPORT OF DAMAGES—MEASURE OF RECOVERY.

1. A., the master and owner of the canal boat M., filed a libel in rem, in admiralty, in the district court, against the screw steamer C., for himself and for an insurance company, alleging that the company was the insurer of the cargo of the M., and that the M., and her cargo had been damaged by a collision between the M. and the C., through the fault of the C. The libel did not allege that the cargo was owned by an innocent party, nor that the insurance company had paid the loss. The collision occurred in a slip, as the C. was moving out. The district court held that the C. was in fault for allowing herself to be drawn over toward the M., by a stern line fastened to the opposite pier, which was not cast off in time; and that the M. was in fault for being insufficiently fastened, so that she was drawn over towards the C. by the suction caused by the screw of the C. On appeal by both parties, this court *held*, for the same reasons, that both vessels were in fault, and made a decree holding the C. liable for only one-half of the damages sustained by both the M. and

her cargo. After the decision of this court was announced, the insurance company moved (1) that it might be allowed to prosecute the suit for its own interest; (2) that it might be made a party libellant, and allowed to prove that the cargo on board the M. was owned by an innocent party, that it was insured against loss by the company, and that the loss had been paid in full; (3) that the record brought up on appeal might be amended by inserting in the apostles the minutes of the commissioner, on the reference in the district court to ascertain the amount of damages; and (4) that a decree might be entered against the C., and in favor of the insurance company, for the full amount of the damages to the cargo: *Held*, that the company might, if necessary, be admitted as a party, in order to settle its rights to its share of the recovery, as against the libellant, but only to that extent.

[Distinguished in The Martino Cilento, 22 Fed. 861. Cited in The Iniziativa, 50 Fed. 231.]

2. As the M. was sold three times between the time of the collision and the time of the decree of the district court, and as the remedy over against the M., in favor of the C., had been lost by the delay, the company could not now be allowed to make proof of the innocent ownership of the cargo, so as to charge the C. with the entire damage to the cargo, under the rule established in The Atlas, 93 U. S. 302, although the decision in The Atlas was not made until after the libellant had appealed.

[Cited in The City of New York, 25 Fed. 153.]

3. As the report of the commissioner was not excepted to, it was not necessary that his minutes of testimony should be brought up.

4. There could not be a decree against the C. for the full amount of the damages to the cargo.

[Cited in The Nevada, Case No. 10,131; The Gulf Stream, 58 Fed. 606.]

[Appeal from the district court of the United States for the southern district of New York.]

In this case, there were appeals by both parties from a decree of the district court [case not reported], in a suit in rem, in admiralty, in a cause of collision, finding both vessels to have been in fault, and dividing the damages.

Robert D. Benedict, for libellant.

James W. Gerard, for claimants.

WAITE, Circuit Justice. The libellant was, at the time of the occurrence hereinafter mentioned, the master and owner of the canal boat Montana, having on board a cargo of wheat, taken in at Oswego, New York, to be transported to New York City, and there delivered to Tompkins & Co., consignees. Between 2 and 3 o'clock in the afternoon of November 11th, 1871, the boat, with her cargo, was moved into the slip between piers 44 and 45 North river, in New York City, for the purpose of having her cargo transferred to the steamship Erin, then moored along the north side of pier 44. The Erin was a sea-going steamer, 370 feet long and 41 feet wide, lying with her bow towards the river, and her stern near to an L, on pier 44, 47 feet wide, and extending 130 feet from the bulkhead of the slip at the street. The Montana was 96 feet long and 17 feet 6 inches wide. Soon after her arrival in the slip, she was

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

moored along side of the lighter Fret, 23 feet wide, and from 60 to 70 feet long, which lighter was made fast to the Erin, opposite the after hatch of that vessel, with her bow towards the bulkhead, by lines leading from her deck, bow and stern, to the deck of the Erin. The deck of the Erin was much higher out of water than that of the Fret. The Montana, with her bow also toward the bulkhead, was made fast to the Fret by lines from her stern and middle cleats, which latter cleat was about her midships, to the bow and stern of the Fret. The decks of these two boats were about equal distances above the water. The bow of the Montana extended from 25 to 30 feet beyond that of the Fret, and there was no line from it either to the Erin or the pier. A floating elevator, 24 feet wide, and 100 feet long, was made fast to the Erin at her middle hatch, between the Montana and the river. Outside of, and made fast to, this elevator, was a grain barge 17 feet 6 inches wide, and 100 feet long. The slip was 160 feet wide at the river, and varied from that to 163 feet, until it reached the L. From there to the bulkhead, it was 115 or 116 feet wide, and, alongside the L, in the narrow part of the slip, two coal barges were moored side by side. The depth of the water in the part of the slip where the steamer laid varied from 18 to 22 feet. The steamship City of Paris, 416 feet long, and 40 feet 6 inches wide, was lying in the slip along side of pier 45, when the Montana came in. Her bow was towards the river, and her stern was on a line nearly at right angles with the end of the L, on pier 44. She was an ocean steamer, and one of a line of packets plying between New York and Liverpool, and leaving that slip on regular sailing days. When the Montana came in, the steamer had her steam up, and there was every indication that she was about to leave upon her voyage. This was observed and understood by the libellant. Some time before she left, she got out lines from her bow and stern, took them across the slip, and made that from the bow fast to pier 44, and that from the stern to the L. By these lines she was worked off from pier 45, 10 or 12 feet, so as to avoid collision with her own dock and the sheds upon it, as she moved out of the slip. A short time before starting, the usual whistle was blown. The captain, being on the bridge of his vessel, sent aft to inquire whether all was clear, and, receiving an affirmative answer, blew the last whistle and gave orders to go ahead. The lines leading to pier 45 were let go, but both of those leading across the slip, and made fast upon pier 44 and the L, were held on. No special notice was given from the steamer to the boats in the slip, that she was about to leave, but the libellant, standing upon the deck of his boat, saw what was being done, and knew what it meant. He took no additional precautions to protect his boat against injury by the movement of the steamer, supposing what he had done was suffi-

cient. The officers and men on the steamer were in a situation to see how the Montana was moored and fastened, and did see her when the orders were given to go ahead. The movement of a large steamer like the City of Paris out of her slip necessarily causes a displacement of the water, and the revolution of her propeller has a tendency to suck in under her stern, with great force, everything which comes within its influence. This is a fact well understood by all engaged in that business. The stern line leading from the steamer to the L was not let go until she had gone some distance ahead. This caused her stern to swing over towards the Montana. The suction created by the revolution of the propeller drew the bow of the Montana toward the steamer, and, when the propeller passed by the Montana, one of its flanges struck her under water about 20 feet from her bow, causing a leak and damaging the cargo. The boat herself suffered but slight injury. The second officer of the steamer noticed the Montana moving toward the steamer, and called out to stop the engine, but no attention was paid to him, and the steamer proceeded to sea without any knowledge, on the part of her officers, of what had occurred. Usually, when a steamer goes out under the circumstances which existed at this time, the stern line is let go before she is started ahead. No notice was given to the Montana, that any other than the usual course was to be taken in this case. The swinging of the steamer on her stern line contributed directly to the collision which occurred, but still there would have been no collision if the bow of the Montana had not been drawn toward the steamer.

While it is the duty of a large steamer, in leaving her dock, to take care that no unnecessary damage is done to other vessels lying in proximity to her, it is equally the duty of the other vessels to take all reasonable precautions to protect themselves from the dangers to which they will be exposed by her movements. The libellant, in this case, had ample notice that the steamer was about leaving. He saw or could have seen her lines passing across the slip. He knew, or ought to have known, that, unless his boat was securely fastened, she would be drawn in under the stern of the steamer and exposed to being struck by the propeller as it passed. He also knew, or ought to have known, that, with the Fret lying close to the Erin, fastened only by lines leading up to the deck of that vessel, she could be moved to some extent outwards into the slip. With his own boat fastened only by lines at her stern and midships, it must have been evident to him that her bow could be swung some distance outwards. He also could and did see that the space between him and the steamer was not more than 20 or 25 feet. It needed, therefore, but a slight movement of the two vessels toward each other to bring them together. Under such circum-

stances, it was clearly his duty to be specially careful that the bow of his boat, which was the first to be exposed to the action of the propeller, was held fast in its position. It is evident that a line from his bow to the Erin, properly fastened, would have prevented the accident. This simple precaution he failed to take. It matters not that neither of the lines by which he was made fast to the Fret was broken. His boat was left so that she could swing to some extent upon her line amidships, and she did do so. This, added to the swing of the stern of the steamer, caused the loss. The libellant was, therefore, clearly in fault.

But the steamer was equally in fault. If her stern line had been cast off before she started, there is no reason to believe that her stern would have gone over toward the Montana, as it could not but do with the line fast. Thus the injury was caused by the combined fault of the two vessels. That of neither was sufficient alone to produce it. The damages of the parties in fault must, therefore, be divided between them.

It is contended, however, that, under the rule as established in the case of The Atlas, 93 U. S. 302, the owners of the cargo are entitled to their damages in full, as they are innocent parties. The libel is filed by the master and owner of one of the faulty vessels, for himself and the Pacific Mutual Insurance Company, of New York, and there has been no intervention by any owner of the cargo. It is averred that the insurance company was the insurer of the cargo, but it is nowhere averred or proved that the owner of the boat was not the owner of the cargo, or that the insurance company has paid the loss. There is nothing in the case, therefore, as it stands, to relieve the cargo from the fault of the Montana. The decree of the district court is affirmed, and a decree to that effect may be prepared.

Subsequently, the Pacific Mutual Insurance Company moved the court, (1) that it might be allowed to prosecute the suit for its own interest; (2) that it might be made a party libellant, and allowed to prove that the cargo on board the Montana was owned by an innocent party; that it was insured against loss by the company, and that the loss had been paid in full; (3) that the record brought up on appeal might be amended, by inserting in the apostles the minutes of the commissioner, on the reference in the district court, to ascertain the amount of damages; and (4) that a decree might be entered against the City of Paris, and in favor of the insurance company, for the full amount of the damages to the cargo.

WAITE, Circuit Justice. The original libel was filed by the master and owner of the Montana, "for himself and for the Pacific Mutual Insurance Company of New York." In it the libellant avers, on information and belief, that "the said Pacific Mutual Insurance Company were insurers of about 7,405 bushels of wheat, constituting the cargo," and "that the damage done to the cargo by reason of the said collision, and the flooding of the cargo with sea-water, was so great as to cause an almost total loss of the said cargo to the owners thereof, and that, by reason of the damage done to said canal boat, the libellant herein, and the insurers of the cargo, have suffered loss," &c. Under these averments there will be no difficulty in framing the decree, if it is desired, so as to separate the amount of the recovery on account of the insurer of the cargo from that on account of the owner of the boat. Unless there is a dispute between these parties as to their respective interests, there can be no necessity for the actual intervention of the company. The court will, upon its own motion, make the necessary separation, if the parties intimate such a desire. But, if the division is not agreed upon, and a controversy arises as to the amount each is entitled to, the insurance company will be allowed to appear and prosecute the suit to that extent, for its own interest. The libellant, having admitted that he sued for the company as well as himself, and having succeeded in recovering something for his beneficiary, cannot now object to a separation, in the decree, of that which he recovers in trust from that which he recovers as actual owner. If, therefore, it is necessary that the insurance company should be admitted as a party in order to a full and complete settlement of its rights in the action, as against the libellant, an order to that effect may be entered. In this question the City of Paris is not interested.

Upon the other branches of the motion, an entirely different question arises. The collision occurred November 11th, 1871. The libel was filed December 13th, 1871. At that time the Montana was owned by the libellant, and could have been proceeded against by the owner of the cargo or the insurance company, as well as by the City of Paris. The libel made no claim of any innocent ownership of the cargo. The hearing was had in the district court without any proof whatever of the interest of the insurance company, and a decision was rendered, June 10th, 1874, finding both vessels in fault, directing a division of the damages, and ordering a reference to ascertain the amount of damages. The commissioner filed his report February 6th, 1875. No exceptions were taken to this report, and a decree was accordingly entered, February 23d, 1875, dividing the damages as found and stated by the commissioner. The appeal of the libellant was taken March 1st, 1875, and perfected soon after. Between the time of the collision and the decree below, the Montana was sold and conveyed three times—once July 31st, 1872, again April 29th, 1873, and again June 29th, 1874. To allow the insur-

ance company to make proof now of the innocent ownership of the cargo, would be to allow it to make a new case against the City of Paris, not specifically stated in the libel, after all remedy over against the Montana had been lost by delay. An owner of cargo injured by a collision between two vessels, both of which are at fault, may sue either one or both of the vessels, as he chooses, and recover the full amount of his loss. The Atlas, 93 U. S. 302. Without doubt, too, the master or owner of the carrying vessel may sue in his own name for the benefit of the owner of his cargo; but if, in such case, a recovery is sought for the full amount of the loss, notwithstanding the fault of the party in whose name the suit is brought, the facts which give the right to such a recovery and the claim should be clearly stated, or otherwise made to appear upon the record. This is because the prosecuted vessel may, in such a case, by some appropriate form of proceeding, call upon the other vessel to respond in the action for its share of the loss. Unless this is so, it would be in the power of the carrying vessel, by commencing suit in the name of its owner, for the benefit of the shipper, to relieve itself from all liability for a loss to its cargo, resulting in part from its own fault.

If the owner of the cargo adopts as his own a suit commenced by the owner of the carrying vessel for his benefit, he is bound by the case which is made on his account. If that case does not disclose his innocence, or his right to claim for his whole loss, even though it happened in part through the negligence of his carrier, he must suffer the consequences of that omission. When this suit was commenced, the Montana could have been sued by the insurance company jointly with the City of Paris, and, if that had been done, each would have been decreed to pay one-half the loss. If the case had been so stated, in the libel actually filed, as to relieve the cargo from the consequences of the fault of the Montana, the City of Paris might have brought the Montana into the suit, to answer for the consequences of her own wrongful acts. This was not done, and, down to the time of the decision below and the reference to ascertain the amount of damages, nothing had been done in the case, or stated in the pleadings, which called upon the owners of the City of Paris to take affirmative action for the purpose of relieving themselves from liability for more than one-half the loss, in case the Montana was shown to have been in any respect in fault. Previous to the decision the right of action against the Montana had been lost by laches and delay. At that time, it is conceded that neither the insurance company nor the City of Paris could have proceeded against her. The laches which barred the action is chargeable solely to the insurance company. To allow the company now to make a new case against the City of Paris, and recover for the whole loss, after, by its own neglect, the Montana had been relieved from liability for its share, would be grossly inequitable. If the difficulty rested upon the failure of proof alone, the case would be different. As it is, neither the proof nor the libel, at the time of the decision below, would have justified any other decree than the one which was given.

I am aware, that, until the case of The Atlas, which was after this appeal, the supreme court had never decided that any innocent party could recover from one of two faulty colliding vessels the full amount of his loss, and that, possibly, until that time it may not have been considered necessary to state or prove the fact of innocent ownership, in a case like this. If the rights of the parties had not been changed by the delay, this would be a good reason for allowing the original defects in these pleadings and proofs to be supplied now. In admiralty, amendments are liberally allowed, and opportunities to supply omissions in proof are freely afforded, when the equity of a case is plain, but care is always taken to see that wrong is not done in that way. Here, as has been seen, the rights of the parties have been changed by the delay, and wrong would be done to the City of Paris if the insurance company is permitted to make its new case. For that reason, I am clear that this part of the motion should be overruled.

It only remains to consider the application to amend the record by inserting in the apostles the minutes of the commissioner on the reference in the district court to ascertain the amount of damages. The commissioner made his report February 6th, 1875, stating his findings from the evidence submitted to him, but making no reference to any return of the evidence. It is now said, that the minutes of the testimony were put on file below, February 9th, 1875. In the order of reference the court did not direct a return of the evidence. No exceptions were taken to the report, and it nowhere appears that the commissioner was requested by either party to report the evidence. If actually filed, it was never considered or acted upon in the court below. No question raised below required the court to examine it. No question is raised here upon the report. All parties appear to be satisfied with the result reached by the commissioner. Under such circumstances I do not think the minutes of the commissioner are at all necessary for the proper consideration of the case here. If sent up, they can only be considered in connection with questions raised upon the report. As no such question has as yet been made here, the motion to amend must be denied. If, in any adjustment of the amounts payable to the owner of the boat and the insurance company, respectively, an examination of this evidence shall become important, nothing now decided will be permitted to have the effect of preventing another application to bring it into the record, from

the court below. The practice in admiralty in respect to the disposition and use of testimony taken before a commissioner upon a reference to state an account, is not different from that in equity upon a reference to a master for a like purpose. The rule in equity is clearly and correctly stated by Mr. Justice Clifford, in Union Sugar Refinery v. Mathiesson [Case No. 14,398].

The motions are all overruled, except that which relates to the allowance of leave to the insurance company to prosecute the suit in its own interest. As to that, an order may be entered permitting the company to appear and prosecute the suit, as between itself and the libellant, to the extent that may be necessary for the purpose of ascertaining its share of the recovery from the City of Paris, upon the principle of an equal division of the damages resulting from the collision, between the Montana and the City of Paris. For the purposes of any further prosecution against the City of Paris, the motion is overruled.